UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN SPITE TELECOM LLC,<br>          Plaintiff,<br><br>          v.<br><br>ROSCITI CONSTRUCTION<br>COMPANY LLC, HUB FIBER<br>LOOP, LLC, and ANTHONY<br>ROSCITI, JR.,<br>          Defendants. | No. 22-cv-12089-IT |

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SANCTIONS,
TO COMPEL PRODUCTION, AND TO STRIKE

CABELL, Chief U.S.M.J.

     Plaintiff In Spite Telecom, LLC ("In Spite") has brought an
action for breach of contract against defendants Rosciti
Construction Company LLC ("RCC"), Hub Fiber Loop, LLC ("Hub
Fiber"), and Anthony Rosciti ("Rosciti") (collectively,
"defendants").  In 2017, the defendants began developing a
telecommunication conduit system and installing fiber optic lines
("the project") in and around the Boston area.  In Spite contends
the defendants breached a verbal agreement to pay In Spite $300,000
for In Spite's consulting services on the project.  In addition to
a claim based on the defendants' breach of this agreement, the
operative complaint sets out claims for breach of the implied

covenant of good faith and fair dealing, unjust enrichment, and violation of M.G.L. ch. 93A, § 11.  (D. 21).

Against this backdrop, In Spite moves to compel the production of the defendants' bank statements for the period of March 1, 2017 to September 1, 2021.  In Spite also asks through the same motion that the court impose sanctions on the defendants under the court's inherent power, strike the defendants' March 25, 2024 memorandum of law filed without leave of court, and award In Spite its attorney's fees and costs under Federal Rule of Civil Procedure ("Rule 37(a)(5)").  (D. 100, 101).

For the following reasons, In Spite's motion (D. 100) is allowed in part to the extent of requiring production of bank statements for the May 1 to September 1, 2021 time period, and is otherwise denied.  The defendants for their part also request sanctions (D. 103) but that request too is denied.

I.   **LEGAL STANDARD**

Regarding discovery, In Spite bears the burden as the party seeking the bank statements at issue of showing the requested information is relevant.  *See Controlled Kinematics, Inc. v. Novanta Corp.*, Civil Action No. 17-cv-11029-ADB, 2019 WL 3082354, at *2 (D. Mass. July 15, 2019) ("[p]arty seeking information in discovery over an adversary's objection has the burden of showing its relevance.").  If In Spite satisfies this burden, the defendants "bear[] the burden of showing that [the] discovery

request is improper." *Close v. Acct. Resol. Servs.*, 557 F. Supp. 3d 247, 250 (D. Mass. 2021). Regarding sanctions, a court may award sanctions under its inherent power premised on a "finding that a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *F.A.C., Inc. v. Cooperativa De Seguros De Vida De P.R.*, 563 F.3d 1, 6 (1st Cir. 2009) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)).

## II. **THE PARTIES' ARGUMENTS**

### A. **Bank Statements**

In seeking to compel the bank statements, which are the subject of RFP 24, In Spite asserts they are relevant to: (1) identify the entities involved in the project; (2) the scope of such entities' involvement; and (3) the payments, funding, and closing of the project. (D. 101, p. 1). In Spite also contends that Hub Fiber's and Rosciti's last supplemental response on March 25, 2024 to RFP 24 was improper because it relied on a funds flow memorandum and asserted that the information therein rendered production of the bank statements unreasonably cumulative. (D. 101, p. 2) (D. 101-7, No. 24). To that end, In Spite describes the memorandum as providing only partial information and, in fact, justifying discovery of the statements. (D. 101, pp. 3-4). In Spite additionally submits that Rosciti should include the bank statements of TruAccess Networks, LLC ("TruAccess"), which he owns (D. 65-3, p. 65), in his production because it is involved in the

3

project and he has such records within his possession, custody, and control. (D. 101, pp. 3-4). As to RCC, In Spite maintains that RCC's bank statements will address the critical issue of the issuance of a $200,000 invoice to RCC and objectively substantiate the reason for a reduction in the $300,000 owed In Spite for its services. (D. 101, p. 2).

The defendants argue in opposition that Hub Fiber's and Rosciti's responses were valid, specific, and in compliance with Federal Rule of Civil Procedure 34(b)(2) ("Rule 34(b)(2)"). (D. 103, pp. 6-11). They assert that the court has not ruled on their objections to producing the bank statements and that their March 25 response satisfied Rule 34(b)(2). Pertinent to the funds flow memorandum in the March 25 response and relying on Federal Rule of Civil Procedure 26(b)(2)(C)(i) ("Rule 26(b)(2)(C)(i)"), the defendants submit that the memorandum is a more convenient, less burdensome, and/or less expensive source for the information.[1] (D. 103, pp. 9-10). With regard to RCC, the defendants contend that RCC cannot produce the bank statements because they are not within its possession and/or control. (D. 103, p. 11).

---

[1] The March 25 response to RFP 24 objects to producing the bank statements because: (1) they are unreasonably cumulative of the information in the funds flow memorandum; and (2) the March 1, 2017 to September 1, 2021 timeframe for the bank statements is overbroad. (D. 101-1, No. 24) (D. 101-7, No. 24).

B.   <u>Sanctions</u>

In seeking sanctions under the court's inherent power,[2] In Spite sets out a purported pattern of sanctionable behavior and ongoing interference with discovery.  As part of that pattern and interference, In Spite identifies the following:  a May 2023 monetary sanction against Rosciti for his failure to appear at a mediation before a magistrate judge; Hub Fiber's and RCC's failure to prepare Rosciti, its corporate designee, for a Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)") deposition; the defendants' initial May 18 and subsequent November 2, 2023 "'see all documents' responses" to RFPs; and the defendants' failure to provide native files of digital documents, as agreed, along with their redaction of material for reasons other than a privilege. (D. 101).  After a March 11, 2024 hearing on a second motion for sanctions and to compel,[3] In Spite argues that Hub Fiber's and Rosciti's March 19 and 25, 2024 supplemental responses to RFP 24

---

[2] The pending motion and supporting memorandum do not expressly refer to the court's "inherent power" as the legal basis for the multitude of sanctions In Spite requests.  However, the supporting memorandum refers to the defendants' bad faith and cites *Confederación Hípica de P.R., Inc. v. Confederación de Jinetes Puertorriqueños, Inc.*, 30 F.4th 306, 317 (1st Cir. 2022), as "reviewing [the] sources of authority to sanction."  (D. 101, p. 7).  The authority for sanctions cited in *Confederación* that applies to the broad range of sanctions In Spite requests is the court's inherent power.  Accordingly, the court construes the sanctions request as based on the court's inherent power court's inherent power.

[3] In Spite previously had requested sanctions in a first motion for sanctions and to compel, but the motion was denied.  (D. 61, 77).

raised new boilerplate objections not raised in previous responses. (D. 101, pp. 4-5, 7).

In opposing sanctions, the defendants rely on the specificity of their March 25 response to the bank statements request based on their aforementioned arguments. They argue that even if their response was insufficient under Rule 26(b)(2)(C)(i) or Rule 34(b)(2)(B), sanctions are inappropriate because the response was substantially justified under Rule 37(a)(5).[4] (D. 103, p. 11).

At present, In Spite requests the following sanctions: "attorney's fees for discovery following service of the original requests;" a default judgment; and an evidentiary presumption that the documents not produced would have been favorable to In Spite. (D. 101, p. 9). In Spite also asks for an order requiring the defendants to supplement written discovery responses and appear for a further deposition following such supplementation. (D. 101, p. 9).

---

[4] Although the defendants do not reference Rule 37(a)(5), they cite to *DMO Norwood LLC v. Kia Am., Inc.,* 2023 WL 5353744, at *6 (D. Mass. Aug. 21, 2023), which addresses the rule's substantially justified standard.

III.  **RELEVANT BACKGROUND**[5]

A.  **The Project**

In early 2017, the defendants began developing the conduit system and installing the fiber optic lines for the contemplated project.  (D. 21, ¶¶ 7-9).  Hub Fiber, which Rosciti owned, purchased the conduit system.  (D. 65-2, pp. 24-26).  In March 2017, In Spite and the defendants entered into a verbal agreement for In Spite to "provide consultation services" for the project in return for $300,000.  (D. 21, ¶¶ 10-12).[6]  The services involved providing estimates of project costs, sourcing materials, acquiring conduit, and permitting.  (D. 21, ¶ 11).  In Spite provided these services for the defendants between March 2017 and July 2021.  (D. 21, ¶ 14).

When the defendants' payment was due at the close of the project on June 30 or in July 2021, the defendants failed to pay In Spite at that time.  (D. 65-3, pp. 8-9) (D. 21-3, p. 6) (D. 21, ¶¶ 15, 20).  On September 1, 2021, In Spite and the defendants

---

[5] The facts are culled primarily from the operative complaint and the submissions filed by the parties in connection with the motion for sanctions and to compel. *See, e.g., Dimaria v. Concorde Ent., Inc.*, Civil No. 12-11139-FDS, 2013 WL 4056213, at *1 n.1 (D. Mass. Aug. 9, 2013).  The operative complaint depicts the agreement as between In Spite and "Defendants," and Rosciti as "a member and manager of RCC" and Hub Fiber.  (D. 21, ¶¶ 5-6, 11-12).  The background recitations in this opinion are *solely* for purposes of resolving the pending motion for sanctions and to compel.

[6] At a deposition, Rosciti denied that he or any of "[his] entities" entered into an agreement with In Spite.  (D. 65-2, p. 188).  The deposition was a combined, single deposition during which Rosciti testified as an individual as well as a Rule 30(b)(6) designee for RCC and Hub Fiber.  (D. 65-2, pp. 9-13, 204).

7

agreed to a reduced amount of $200,000 for In Spite's services because Rosciti "did not get the dollar amount for the total sale that he was hoping to achieve." (D. 101-3) (D. 21, ¶¶ 16-17). As instructed by Rosciti, Meehan sent Rosciti the invoice for this amount to Rosciti's email (arosciti@truaccessnetworks.com) the following day. (D. 21-2) (D. 21, ¶¶ 16-18) (D. 65-3, pp. 8-9). The invoice itself is addressed to "Rosciti Construction." (D. 21-2). For more than a year thereafter, In Spite's repeated payment-related requests via text messages from Meehan to Rosciti were not successful. (D. 21, ¶¶ 6, 19-23) (D. 21-3).

During 2021, Meehan also worked at JBC Utility, LLC ("JBC"). In addition to other duties, he was responsible for billing TruAccess for services that JBC performed for TruAccess. (D. 65-3, pp. 6, 9, 65-66). In 2021, Rosciti was behind in paying JBC invoices for these services. (D. 65-3, pp. 65, 71). In 2021, Meehan contacted Rosciti by email and text seeking payment of these overdue TruAccess invoices. (D. 65-3, pp. 68-72). Thus, during the time that Meehan was asking Rosciti by text to pay JBC for its services to TruAccess, Meehan was also asking him by text to pay the amount the defendants owed In Spite. (D. 65-3, pp. 69-72) (D. 21, ¶¶ 20-21) (D. 21-3). Against the backdrop of the defendants' continued nonpayment for the project, In Spite filed suit in December 2022. (D. 21, ¶¶ 19-23).

In general, the parties worked together during discovery and through requested brief extensions of various discovery deadlines.[7] In Spite agreed to the defendants' request for an extension of discovery and the parties subsequently jointly requested a short extension of written discovery.  (D. 37, 39).  In like fashion, In Spite did not object to the defendants' motion for a 60-day extension of the deadline to complete fact discovery.  (D. 50, 52).  The defendants in turn subsequently agreed to In Spite's request to briefly extend the time for In Spite to respond to the defendants' discovery requests.  (D. 55).  Thereafter, the defendants sought a two-week extension to complete fact depositions, with In Spite's assent.  (D. 57, 58).  In August 2023, the parties jointly requested an extension to serve third-party subpoenas to August 25, 2023, which the court allowed.  (D. 63). Further, the defendants did not oppose In Spite's subsequent motion to serve two additional third-party subpoenas.  (D. 75, 82).  At an October 13, 2023 hearing on the first motion to compel and for sanctions, the parties cooperatively discussed and worked together in open court to resolve certain matters related to admissions.

---

[7] That said, the cooperation was not all-encompassing, as evidenced by the first and second motions for sanctions and to compel as well as the third and pending motion for sanctions and to compel, all filed by In Spite.  (D. 61, 83, 100). In Spite's requests for sanctions demonstrate the parties' growing disagreements particularly anent to the sufficiency of the defendants' responses to RFPs, Rosciti's conduct during his deposition, and the adequacy of Rosciti's preparation as a Rule 30(b)(6) deponent.

**B.**   <u>Second Motion for Sanctions and to Compel</u>

In Spite filed the second motion for sanctions and to compel on December 15, 2023.  (D. 83).  Among other arguments, In Spite complained that the December 1, 2023 supplemental response (D. 84-5) improperly responded "None" to multiple RFPs.[8]  The motion also took issue with the defendants producing a privilege log listing 242 documents as privileged when the "privilege" and redactions were due to a nondisclosure agreement.  (D. 84, pp. 4-5) (D. 84-6) (privilege log listing 242 documents described as "[p]roprietary information protected by nondisclosure agreement").  In Spite further argued that Rosciti's response to RFP 24 for bank statements was "provably false" because the funds flow memorandum identified a bank account in Rosciti's name.  In Spite also complained that the defendants produced the documents in one combined PDF file rather than the previously agreed native format.  On December 27, 2023, the defendants submitted another supplemental response, which continued to respond "None" to multiple requests, including RFP 24.

At the March 11, 2024 hearing on the motion, the court ordered each defendant to respond separately to the requests.  The court also required a clearer response than "None," such as, for example,

---

[8] A November 15, 2023 email from In Spite's counsel to the defendants' counsel briefly noted in the context of a lengthy paragraph that he could respond "none [to] responses if and where appropriate."  (D. 84-7, p. 4).

a statement that there are no bank records with respect to that defendant.  Notably, the court directed the parties to comply with the rulings within 14 days and indicated it would assess sanctions thereafter.

After the hearing, the defendants provided two supplemental responses to the RFPs within the next 14 days, one on March 19 and a second on March 25, 2024.  (D. 101-1) (D. 101-7).  As instructed, the defendants segmented the supplemental responses for each defendant.  In response to RFP 24, the defendants did not produce bank statements.  Rather, RCC stated it lacked possession and/or control of any bank accounts related to this matter.  In the March 19 supplemental response, Hub Fiber and Rosciti described RFP 24 as "vague, overbroad, unduly burdensome, irrelevant and outside the scope of discovery."  (D. 101-7, No. 24).  In the March 25 supplemental response, they identified the previously produced funds flow memorandum as providing the information sought in RFP 24.  The responses characterized any further discovery as unreasonably cumulative as well as unreasonable and unduly burdensome.[9]  (D. 101-1, pp. 16-17).

---

[9] For ease of reference and context, the March 25 response by RCC and Hub Fiber is set out below.  Rosciti's response is substantially the same as Hub Fiber's response.

24. Bank statements for all of your accounts from March 1, 2017 through September 1, 2021.

**Supplemental Response No. 24**:

Dated June 30, 2021, the funds flow memorandum described the closing as a sale in excess of $5.5 million of "certain assets and liabilities" of Hub Fiber, i.e., the conduit system.  (D. 65-3, pp. 51-52) (D. 101-5, p. 1).  It also set out a wire distribution schedule of the proceeds to individuals and entities, including Rosciti, TruAccess, and RCC.  (D. 101-5, p. 6).

## IV.  DISCUSSION

As noted at the outset, the plaintiff's four-part motion seeks to compel bank statements dating from March 1, 2017 through September 1, 2021, impose sanctions, strike the opposition

---

**ROSCITI CONSTRUCTIO**N: Notwithstanding the aforementioned objections, Rosciti Construction is not in possession and/or control of any bank accounts which relate to this matter pursuant to Rule 26 of the Federal Rules of Civil Procedure.

**HUB FIBER:** . . . Hub Fiber objects on the basis that the request is vague, overbroad, unduly burdensome, irrelevant and outside the scope of discovery articulated in Rule 26.  Specifically, the request seeks bank statements from all "accounts" from March 1, 2017 through September 1, 2021.  Clearly, the request seeks discovery which is unreasonably cumulative because the financial status of Hub Fiber that In Spite seeks, as it pertains to the transaction or occurrence which is the subject matter of the current action, is found in bates range 0508- 0513.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i) ("the court must limit frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:  the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is     more convenien[t], less burdensome, or less expensive.").  In particular, 0508-0513 is the Funds Flow Memorandum detailing the wire distribution schedule at the close of [the project].  The Funds Flow Memorandum illustrates the recipient, the amount transmitted and the deposit account the funds were transferred to.  Accordingly, Hub Fiber provided the information In Spite seeks from Request No. 24 and any further discovery is unreasonable and unduly burdensome.

(D. 101-1) (ellipses omitted).

memorandum, and award attorney's fees and costs under Rule 37(a)(5).  The court addresses each matter seriatim.

## A.  <u>BANK STATEMENTS</u>

As noted, In Spite argues that the bank statements sought from the defendants in RFP 24 are relevant and not unreasonably cumulative.  In Spite also argues that Rosciti's production of the same should include TrueAccess' bank statements for bank accounts used in connection with the project.  (D. 101, pp. 3-4, ¶ 5).  The defendants argue, *inter alia*, that the production of the funds flow memorandum obviates the need to produce the bank statements because the former is a more convenient, less burdensome, or less expensive source for the information.  (D. 103, p. 10).

The law is well settled.  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Rule 26(b)(1).  Relevance is "broadly construed at the discovery stage." *Cabi v. Boston Children's Hospital*, No. 15-cv-12306-DJC, 2017 WL 8232179, at *2 (D. Mass. June 21, 2017) (quoting *Green v. Cosby*, 152 F. Supp. 3d 31, 35 (D. Mass. 2015)).  Although Rule 26(b)(1) "permits liberal discovery of relevant information," the scope of such "discovery is not unlimited." *Cumby v. Am. Med. Response, Inc.*, Case No. 3:18-cv-30050-MGM, 2019 WL 1118103, at *3 (D. Mass. Mar. 11, 2019) (citation omitted).  Pertinent to the defendants' arguments, Rule 26(b)(2)(C)(i) requires the court to restrict

discovery if it is "unreasonably cumulative . . . or if the information can be obtained from some other source that is more convenient, less burdensome, or less expensive." *Id.* (citing Rule 26(b)(2)(C)(i)) (internal brackets omitted). Moreover, "the court must limit" discovery if it falls outside the scope of Rule 26(b)(1). Rule (b)(2)(C)(iii).

## 1.  **Relevance**

The defendants' bank statements are relevant to the breach of contract claim as well as the other claims because the defendants' July 2021 nonpayment and continued nonpayment thereafter provide the catalyst for all the claims. For example, the statements will likely show whether the defendants had the funds to pay the $300,000 contract price at the July 2021 close of the project and the $200,000 reduced contract price as of September 1, 2021. (D. 21, ¶¶ 15-16). After all, the operative complaint describes the agreement as between "[In Spite] and *Defendants*." (D. 21, ¶¶ 10-13) (emphasis added). Rosciti's bank statements are also relevant to show whether he received less than he expected for the sale of the conduit system, which was the basis for In Spite to reduce the contract price from $300,000 to $200,000 in early September 2021. Accordingly, In Spite has satisfied its burden to show the relevance of the bank statements of the defendants at the very least for the time period in and around July 2021 to September 1,

2021.[10]  *See generally Hudson-RPM Distribs., LLC v. Bowditch & Dewey, LLP*, Civil Action No. 19-cv-40095-TSH, 2021 WL 9649662, at *3 (D. Mass. Feb. 12, 2021) ("[T]he standard for relevance in discovery is low.").

## 2.  <u>Proportionality</u>

The defendants' proportionality arguments based on the funds flow memorandum fail to persuade.  Rather, as explained below, the Rule 26(b)(1) factors favor production of the bank statements of Rosciti, Hub Fiber, and TruAccess, limited to the May 1 to September 1, 2021 time period.

### a.  <u>Rosciti's Bank Statements</u>

First, Rosciti's bank statements during this time period will likely illuminate whether Rosciti had access to funds to pay the contract price and whether he received "the dollar amount for the total sale that he was hoping to achieve." (D. 101-3).  Relatedly, the day before Meehan emailed the $200,000 invoice to Rosciti, he texted Meehan a payments chart to bolster the reduction, which included his purported net profit of $892,269.36.  (D. 101-4) (D. 21-3, p. 13).  The one-third reduction of the agreed price in early September 2021 is an important issue in this contract dispute, and Rosciti's bank statements provide an objective basis to quantify the amount Rosciti received and thereby facilitate a comparison to

---

[10]  The relevance of TruAccess' bank statements is addressed in the next subsection.

the amount he had hoped to receive.  *See* Fed. R. Civ. P. 26(b)(1) (noting "importance of the discovery in resolving the issues" as a consideration in evaluating proportionality).

Second, Rosciti's bank statements for the May 1 to September 1, 2021 period bear on Rosciti's credibility.  Here again, the bank statements will indicate whether he did (or did not) receive the dollar amount he was hoping to obtain.  Further, in contrast to In Spite, Rosciti has access to his bank statements.  *See* Rule 26(b)(1) (noting "parties relative access to relevant information" as a consideration in determining proportionality).  Further still, the relatively minor burden for Rosciti to obtain bank statements does not outweigh their likely benefit.  *See id.*

Contrary to the defendants' argument, Rosciti's bank statements are not unreasonably cumulative to the funds flow memorandum.  In addition to an objective assessment of Rosciti's credibility, the statements will provide information regarding transactions over a period of time.  In contrast, the funds flow memorandum targets a discrete time period, the closing.  It is dated June 30, 2021, identifies the parties to the sale of the conduit system, and depicts the schedule of the wire transfers. More, Rosciti's bank statements are not *unreasonably* cumulative because they provide an objective basis to verify Rosciti's receipt of the funds noted in the wire distribution schedule.  *See Thomas v. City of New York*, 336 F.R.D. 1, 2 (E.D.N.Y. 2020) (stating "mere

existence of overlap and some duplication is insufficient to preclude the discovery sought" as "unreasonably cumulative or duplicative").  This is especially true given the importance of the issue of the reduction of the agreed amount.

**b.   <u>Hub Fiber's Bank Statements</u>**

Hub Fiber's bank statements are relevant to the payment of invoices for work done on the project.  In particular, a June 29, 2021 invoice from a subcontractor, Phoenix Communications, Inc. ("Phoenix"), for $1,385,889.20 is billed to Hub Fiber.  (D. 101-5, p. 7) (D. 65-2, p. 46).  TruAccess, however, paid the invoice, according to Rosciti.  (D. 65-2, p. 169).  Hub Fiber's bank statements during this time period will illuminate whether Hub Fiber paid the invoice and therefore may assist the jury in assessing Rosciti's credibility.  In addition, Hub Fiber has access to its bank statements whereas In Spite lacks such access.  Lastly, the burden and expense to Hub Fiber to produce five months of bank statements in its bank account(s) is relatively minimal.  *See* Rule 26(b)(1) (proportionality includes considering whether burden or expense outweighs likely benefit).

**c.   <u>TruAccess' Bank Statements</u>**

Rosciti's production should also include the bank statements of TruAccess for the same time period.  Rosciti owns TruAccess (D. 65-2, pp. 36-37) and the company's bank statements are therefore under his "control" within the meaning of Rule 34(a)(1).  *See*

*Merchia v. Internal Revenue Service*, 336 F.R.D. 396, 398 (D. Mass. 2020) (stating "document is 'under a party's "control" when that party has the right, authority or ability to obtain the document upon demand'") (citations and brackets omitted); *see, e.g., Schwendimann v. Arkwright Advanced Coating, Inc.*, Civ. No. 11–820 (ADM/JSM), 2015 WL 12781248, at *6 (D. Minn. Oct. 14, 2015) ("There is no question but that Schwendimann has possession, custody and control documents of MJ Solutions, Cooler Concepts and NuCoat—companies she owns in whole or in part.").

The bank statements of TruAccess are also relevant and subject to production as proportional to the needs of this case.    The payments chart noted a $2,376,980.44 payment to TruAccess.    (D. 101-4).    Rosciti described the chart as a printout of the sale of the project.  (D. 65-2, p. 135).  Specifically, it "show[ed] those that received money from the project."  (D. 65-3, p. 200) (D. 101-4).    In contrast to this amount, the funds flow memorandum reflected an anticipated wire distribution of $1,191,091.24 to TruAccess.  (D. 101-5).  Perhaps, or perhaps not, the discrepancy may in part reflect TruAccess' payment of the $1,385,889.20 Phoenix invoice and a payment to Accutech Fiber, a supplier of the fiberoptic cable for the project.[11]   Overall, TruAccess' bank statements will likely evidence what amount TruAccess received and

---

[11] Rosciti testified that TruAccess paid Accutech Fiber and, as noted, also paid Phoenix.  (D. 65-2, pp. 165, 169-170).

better allow the jury to assess the important issue of the veracity of Rosciti's representation(s). *See* Rule 26(b)(1) (noting importance of "discovery in resolving the issues" as well as consideration of whether burden or expense outweighs likely benefit).

**d.  RCC's Bank Statements**

With respect to RCC, its recent supplemental responses to RFP 24 state that it is not in *possession* or "*control* of any bank accounts which relate to this matter." (D. 101-1, No. 24) (D. 101-7, No. 24) (emphasis added). Construing "this matter" to mean the project, the court cannot compel bank statements from bank accounts that RCC does not possess or control. *See generally Yourga v. City of Northampton*, Civil Action No. 16-30167-MGM, 2018 WL 4268894, at *1 n.2 (D. Mass. Sept. 6, 2018) ("A court 'cannot compel a party to produce documents that do not exist.'") (citation omitted).

The court notes, though, that RCC does not affirmatively state that it has no such responsive documents in its *custody.* In the event RCC has *custody* of bank statements related to the project (notwithstanding RCC's lack of possession or control), an application of the proportionality factors weighs in favor of producing RCC's bank statements for the May 1 to September 1, 2021 time period. To explain, the June 30, 2021 funds flow memorandum reflects an anticipated wire distribution of $1,385,889.20 to RCC.

(D. 101-5). RCC's bank statements will inform whether RCC received this transfer. In that regard, the statements may indicate whether Rosciti, through RCC, received part of the "dollar amount for the total sale he was hoping to achieve." (D. 101-3); *see* Rule 26(b)(1) (noting importance of "discovery in resolving the issues"). Further, RCC has access to its bank statements whereas In Spite does not have such access. Further still, the burden and expense to RCC to produce five months of bank statements in its bank account(s) is relatively minimal.

In short, Rosciti's, Hub Fiber's, TruAccess', and RCC's bank statements for the May 1 to September 1, 2021 time period are relevant, proportional to the needs of the case, and not unreasonably cumulative. As such, the defendants must produce these bank statements unless they have *already* been produced through another entity.

e.  **Bank Statements Prior to May 2021**

As to bank statements predating May 2021, Rule 26(b)(2)(C) permits the court to limit allowable discovery when it falls outside the scope of Rule 26(b)(1). Exercising this authority, production of bank statements prior to May 2021 is not proportional to the needs of this case.

To begin, the defendants justifiably object to producing bank statements for the entire March 1, 2017 to September 1, 2021 period as overbroad. *See Merchia v. United States Internal Revenue Serv.*,

336 F.R.D. 396, 399 (D. Mass. 2020) ("[C]ourt may limit discovery of relevant information 'geographically and temporally' when necessary "to avoid overly broad and unduly burdensome requests." (citing *Briddell v. Saint Gobain Abrasives Inc.*, 233 F.R.D. 57, 60 (D. Mass. 2005))).  Production of the statements for the more critical May 1 to September 1, 2021 time period reduces the need for additional production.

As a final argument, the defendants assert that In Spite's discovery responses raised general boilerplate objections and it produced only a diminutive 89 documents to the defendants' request for production.  (D. 103, pp. 3-4).  To the extent the defendants seek to avoid production of the bank statements on this basis, the argument lacks merit.  First, Rule 26(d) states that "discovery by one party does not require any other party to delay its discovery" absent a stipulation or court order.  Second, case law does not favor "a 'tit-for-tat' approach to discovery."  *Tr. of Boston Univ. v. Everlight Electronics Co.*, Ltd., Civil Action No. 12-cv-11935-PBS, 2014 WL 12927018, at *3 (D. Mass. Sept. 26, 2014) (citation omitted).

In sum, it is appropriate to compel production of Hub Fiber's, Rosciti's, TruAccess', and RCC's  bank statements from May 1 to September 1, 2021.  Production of bank statements is limited to entries regarding funds that played any role in this litigation.

Other entries, such as funds for other projects or Rosciti's private purchases unrelated to the project, may be redacted.

## B.   <u>SANCTIONS</u>

As noted above, In Spite asks the court to exercise its inherent power to impose the following sanctions: "attorney's fees for discovery following service of the original requests"; a default judgment; an evidentiary presumption that the documents not produced would have been favorable to In Spite; supplementation of written discovery responses; and another deposition following such supplementation. (D. 101, p. 9) (D. 84, p. 14).

It is axiomatic that a federal court has the inherent power to manage the litigation before it "to achieve the orderly and expeditious disposition of cases." *In re Petition for Order Directing Release of Records*, 27 F.4th 84, 89 (1st Cir. 2022) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-631 (1962)). To that end, a court has the discretion to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. Pertinent here, sanctions are permissible when the court finds that the party "acted in bad faith, vexatiously, or for oppressive reasons." *Id.* at 45-46; *accord Pinney v. Bridgewater State Hosp.*, Civil Action No. 23-cv-11006-FDS, 2023 WL 8355917, at *2 (D. Mass. Dec. 1, 2023) (stating court has "inherent power to manage its own proceedings and" control conduct of litigants appearing before it through "sanctions for bad-faith,

vexatious, wanton or oppressive behavior.") (citing *Chambers*, 501 U.S. at 46-50) (additional citations omitted). Lastly, "[b]ecause of their very potency," the court must exercise its inherent powers "with restraint and discretion." *Chambers*, 501 U.S. at 44-45 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)). Guided by this construct, the court examines the sanctions In Spite requests.

1. **Attorney's Fees for Discovery**

In order to obtain attorney's fees as an inherent-power sanction, a showing of bad faith is generally required. *See Confederación Hípica de Puerto Rico, Inc. v. Confederación de Jinetes Puertorriqueños, Inc.*, 30 F.4th 306, 317 (1st Cir. 2022) (reviewing district court's sanction requiring payment of attorney's fees for nonappearance at court-ordered meeting and stating "district court could not, without a bad faith finding[,]" impose sanction "under its inherent power") (citing *Charbono v. Sumski*, 790 F.3d 80, 88 (1st Cir. 2015)); *Jones v. Winnepesaukee Realty,* 990 F.2d 1, 4 (1st Cir. 1993) (noting "federal court possesses inherent power to shift attorneys' fees when parties conduct litigation in bad faith" and such power "should be . . . reserved for egregious circumstances"). In the case at bar, the court concludes that the defendants have not acted in bad faith to a degree warranting sanctions. As an explanation of what

constitutes bad faith, the First Circuit's decision in *Winnepesaukee*, 990 F.2d at 4-5, is instructive.

In *Winnepesaukee*, the First Circuit described the district court's attorney's fees award as flowing from "a supportable finding of bad faith." *Id.* at 5. That finding stemmed from the "'general non-cooperative and often contentious manner' in which" the sanctioned party "conducted the litigation." *Id.* at 5. In addition, many of the filings described by the district court were patently frivolous while others appeared "riddled with demonstrably false allegations." *Id.* at 5 n.5. Conversely, engaging in cooperative behavior and acting in a non-contentious manner counseled against shifting attorney's fees. *See generally id.* (recognizing district court's finding was not inevitable because record supported "two plausible views," and district "court's adoption of one such view" was not "clear error"). Similarly, filings with erroneous but reasonably controverted arguments are not made in bad faith. *See F.A.C.,* 563 F.3d at 8 (reversing "sanctions against attorney where filing that formed basis of award was erroneous but not made in bad faith" (citing *United States v. Figueroa-Arenas*, 292 F.3d 276, 280 (1st Cir. 2002)))

Here, as discussed, the defendants, at times and to some extent, exhibited a cooperative manner. They accommodated In Spite's requested extensions of time and did not oppose third-

party subpoenas.   Although the court allowed the four-hour deposition, Rosciti agreed to make himself available for the deposition on December 20, a date within the time-period In Spite requested.  (D. 81, 84-3, 84-7).  In response to document requests, Rosciti searched for responsive documents in his office after reviewing the requests and engaged the assistance of his controller.  (D. 62-10, pp. 76-77).  Specific to Hub Fiber documents, he checked the emails on his computer, searched that computer, and made efforts to locate another computer that might contain responsive documents.  (D. 65-2, pp. 78-79).

More, the defendants' oppositions to the motions for sanctions and to compel were neither frivolous nor unreasonable. It is true that the defendants' opposition to the pending motion included the aforementioned argument that In Spite's failure to produce documents was a justifiable basis for the defendants' deficient productions under a tit-for-tat approach.  (D. 103, p. 4).  The defendants' opposition as a whole, however, included non-frivolous arguments, such as the funds flow memorandum constituting a more convenient and less burdensome source for the information.  Although ultimately not successful, the argument was not frivolous.

As to producing the documents in their native format, In Spite is correct that the defendants did not produce documents in their native format in the December 1 and 27 supplemental responses.

(D. 101, pp. 6-7) (representing that December 1 supplemental response did not produce native files, as agreed, and December 27 supplemental response "was essentially identical"). The misunderstanding on the part of the defendants' counsel as to what constituted "native format" was evident at the March 11 hearing. Once clarified, the defendants' counsel rectified the matter. In particular, the defendants' counsel represented in the March 19 email to In Spite's counsel that he should have received the native files of the emails and their respective attachments as of March 15. (D. 98-1). Crediting these statements, the December 1 and 27 failures to produce documents in their native format was, at most, a misunderstanding, which the defendants' counsel cured or at the every least made a concerted attempt to cure. *See generally Cook v. Lynn and William, Inc.*, 344 F.R.D. 149, 154–55 (D. Mass. 2023) ("[A]n attorney's representations" to a tribunal "are presumed to be truthful absent any indication that they are untrustworthy."). Further, as indicated, the conduct was not willful. *Cf. Chambers*, 501 U.S. at 45 ("[A] court may assess attorney's fees as a sanction for the '"*willful* disobedience of a court order."'") (citation omitted; emphasis added).

In Spite's contention that the defendants' initial and November 2 supplemental responses "consisted of impermissible 'see all documents' responses" is not unreasonable and indeed

accurate.[12]   (D. 101, p. 6).   "Rule 34 governs the production of documents and prohibits parties from 'producing a mass of undifferentiated documents for the responding party to inspect.'" *Gopher Media, LLC v. Spain*, Case No. 3:19-cv-02280-CAB-KSC, 2020 WL 12688143, at *3 (S.D. Cal. Aug. 24, 2020) (citation omitted); *accord Armor Screen Corp. v. Storm Catcher, Inc.*, No. 07-81091-Civ, 2009 WL 291160, at *2 (S.D. Fla. Feb. 5, 2009) ("[P]roducing party fails to meet its Rule 34 obligations by producing a mass of undifferentiated documents for the responding party to inspect.").

In Spite's argument regarding bad faith nevertheless fails to resonate.  Shortly after the November 2 supplemental response, the defendants changed their responses to RFPs 25, 31, and 39 to "None" in the December 1 supplemental response.  Other responses to RFPs in the December 1 supplemental response targeted only a few documents or responded "None."  Whereas the response to RFP 1 in the December 1 supplemental response continued to refer to a large number of documents (523 to be exact), the RFP itself is improper. Specifically, it does not comply with Rule 34(b), which requires requests to "describe with reasonable particularity each item or category of items to be inspected."   Rule 34(b)(1)(A).   For example, RFP 1 asks for "[a]ll documents and communications that relate to or concern any claim or defense by you in this matter."

---

[12] The responses to the four RFPs in the November 2 supplemental production referred to 430 documents as a group.

(D. 101-1, No. 1).  "[B]road and undirected requests for all documents which relate in any way to the complaint" as well as "request[s] for 'all documents and records' that relate to 'any of the issues,'" do not satisfy Rule 34(b)(1)(A)'s particularity requirement.  *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 575-76 (N.D. Tex. 2018) (citations omitted).

Next, In Spite identifies the defendants' redaction of information in the November 2 supplemental response without an accompanying privilege log and the continued redaction in the December 1 and March 19 supplemental responses as sanctionable behavior.  Whereas the defendants provided a privilege log in conjunction with the December 1 supplemental response, In Spite asserts that the defendants redacted the material for reasons other than a privilege.  (D. 101, p. 6).

Specifically, in the December 15 second motion for sanctions and to compel, In Spite argued that the defendants redacted documents for the non-privileged reason of the nondisclosure agreement.  (D. 84, pp. 5-7).  In opposing the motion, however, the defendants made the non-frivolous argument that In Spite did not confer in good faith with the defendants before filing the motion in violation of Rule 37(a)(1).  (D. 86-1).

Continuing, In Spite's assertion that Hub Fiber's and Rosciti's March 25, 2024 supplemental response asserted new boilerplate objections is mistaken.  The objections are not new.

Rather, the general objections in the December 1 and 25, 2023 supplemental responses made these same objections. (D. 84-5, p. 2) (D. 86-4, p. 2). As such, the assertion of these so-called new objections in the March 25, 2024 supplemental response does not impactfully support a finding of bad faith.

To be sure, Hub Fiber and Rosciti also changed their initial responses of "None" in RFPs 24, 25, and 26 to specifically identified documents. (D. 84-5, Nos. 24-26) (101-1, Nos. 24-26). Hence, their initial responses were likely false. That said, this conduct, placed in the context of the defendants' conduct as a whole, does not rise to the level of bad faith meriting sanctions.

In sum, the defendants did not act in bad faith. To be sure, the defendants' conduct was not always commendable, but egregious circumstances are absent. *See generally F.A.C.*, 563 F.3d at 6 ("court's inherent power to shift attorneys' fees should be used sparingly and reserved for egregious circumstances") (quotation marks omitted). Exercising the court's discretion, In Spite's request for attorneys' fees for discovery is unavailing.

## 2.  <u>Remaining Requested Sanctions</u>

As indicated, a sanction under the court's inherent power entails a "finding that a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *In re Plaza-Martinez*, 747 F.3d 10, 13 (1st Cir. 2014) (citation omitted). Even where, as here, the defendants did not act in bad faith, the

absence of the defendants' bad faith "'does not serve to undermine' sanctions imposed under [the] court's 'inherent power.'" *Pimentel-Soto*, 957 F.3d F.3d 82, 85 (1st Cir. 2020) (quoting *Charbono*, 790 F.3d at 88). "The term 'vexatious' means that the losing party's actions were "frivolous, unreasonable, or without foundation." *Local 285, Service Employees Intern. Union, AFL-CIO v. Nonotuck Resource Associates, Inc.*, 64 F.3d 735, 737-738 (1st Cir. 1995) (addressing award of sanctions under court's inherent power). As the party seeking sanctions, In Spite bears the burden of showing that the defendants' conduct warrants sanctions. *See F.A.C.*, 563 F.3d at 3 ("court could not issue a sanctions order unless FAC had met its burden of showing COSVI had 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'").

Cognizant that the court's inherent power "must be exercised with restraint and discretion," *Chambers*, 501 U.S. at 44, the defendants' conduct does not support the sanctions In Spite seeks. For example, a default judgment, which In Spite requests, is permissible for a true abuse of the discovery process, something lacking here. *See United States v. Ottati & Goss, Inc.*, 900 F.2d 429, 444 (1st Cir. 1990) ("court's inherent powers permitted entry of default judgment against party for abuse of discovery process" (citing *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11-12 (1st Cir. 1985))). In like fashion, In Spite's requested sanctions in the form of an evidentiary presumption or

supplementation of discovery responses is not appropriate.  Here, the defendants did not abuse the discovery process to the degree warranting inherent-power sanctions.  Rather, they used the process to raise several legitimate, albeit at times erroneous, arguments in opposing the motions for sanctions and to compel. They agreed to extensions of time and issuance of third-party subpoenas.  Undeniably, the defendants delayed the adjudication of this case somewhat with their varying responses to RFPs, but they did not engage in abusive litigation practices.  *See Roadway Express,* 447 U.S. at 765 (acknowledging "inherent power of a court to levy sanctions in response to abusive litigation practices") (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 632 (1962)).

Further, although acting in bad faith necessarily differs from acting vexatiously, wantonly, *or* for oppressive reasons given the different terms, the underlying conduct that supports the finding that the defendants did not act in bad faith also supports a finding that they did not act vexatiously, wantonly, or for oppressive reasons.  Specifically, the defendants did not act vexatiously, wantonly, or for oppressive reasons by purportedly failing to provide an appropriate privilege log, initially failing to provide documents in native files, allegedly raising purportedly new objections, and asserting "see all documents" responses.  In Spite fails in its burden to show otherwise.

As another basis for sanctions, In Spite submits that Hub Fiber and RCC failed to properly prepare Rosciti to testify on their behalf. The circumstances, however, do not warrant imposing inherent-power sanctions, including the sanction of requiring Rosciti to appear for a further deposition.

By way of explanation, and as a basis to support sanctions, In Spite identifies an excerpt of the 209-page deposition to establish that Rosciti was not prepared to testify for RCC. (D. 101, p. 6). In particular, RCC failed to appear, or so In Spite maintains, because Rosciti testified that he has "no connection to [RCC]" and the company should not "be named in this lawsuit."[13] (D. 65-2, pp. 11-12).

Rule 30(b)(6) is straight forward. The "organization must designate" a person "to testify on its behalf." Fed. R. Civ. P. 30(b)(6). The designated person "must testify about information known or reasonably available to the organization." Fed. R. Civ.

---

[13] The excerpt reads as follows:

> Q. And what is your connection to Rosciti Construction Company LLC?
>
> A. I have no connection to Rosciti Construction Company LLC.
>
> Q. Are you appearing today on behalf of Rosciti Construction Company LLC?
>
> A. I'm here to appear for the deposition, yes, but Rosciti Construction Company LLC, at the time of this lawsuit, was not owned by myself or -- other than my father and my uncle. They shouldn't be named in this lawsuit, basically.

(D. 65-2, pp. 11-12).

P. 30(b)(6).  To that end, "the corporation is obligated to prepare the designee[] so that [he] may give knowledgeable and binding answers for the corporation."  *In re Montreal Maine & Atlantic Railway, Ltd.*, 608 B.R. 1, 6 (Bkrtcy. D. Me. 2019) (citation omitted).  "A deposing party may not demand that a corporate designee be prepared to speak with encyclopedic authority."  *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 322 F.R.D. 350, 361 (N.D. Iowa 2017) (citation omitted).

An examination of the deposition as a whole shows that Rosciti, at times, provided substantive and knowledgeable answers to the questions.  For instance, he exhibited knowledge about topics one and two in the notice for Hub Fiber's deposition.  Topic one was "[t]he agreement between Defendant and In Spite Telecom LLC entered into in or around March 2017 regarding consultation services for" the project.  Topic two was "[a]ll agreements between Defendant and In Spite Telecom LLC entered into from March 1, 2017 through September 1, 2021."  (D. 62-13).  When asked direct questions about these topics, he provided knowledgeable answers.

> Q.  Are you aware that part of this litigation is a claim by the plaintiff that there was an agreement for In Spite Telecom LLC to provide consulting services?
>
> A.  Yes.
>
> Q.  Okay.  And do you have an understanding of who that agreement would be with, if anyone?
>
> A.  Yes.

Q.  And who would that agreement be with?

A.  John Meehan.

Q.  Sorry.  And on the other side.

A.  The other side of?

Q.  Of that agreement.

A.  Myself.  Me personally.

(D. 65-2, pp. 14-15); *see Vaks v. Quinlan*, Civil No. 18-12571-LTS, 2020 WL 905523, at *3 (D. Mass. Feb. 24, 2020) (refusing to reopen deposition partly because movant failed to demonstrate corporate designee "did not adequately answer questions during his deposition").  Upon review of the entire deposition, the preparation certainly could have been better, but it was nonetheless adequate.  Accordingly, the court does not find that Hub Fiber and RCC failed to properly prepare Rosciti as the Rule 30(b)(6) designee.

In all, use of the court's inherent power to impose one or more of the requested sanctions, including the sanction of reopening the deposition, is not warranted.

C.  **Striking Supplemental Memorandum**

In Spite moves to strike the defendants' supplemental memorandum (D. 98) as filed without leave of court.  Defendants, in turn, justify filing the supplemental memorandum without leave of court because the memorandum explained their efforts to comply

with the court's rulings following the March 11, 2024 hearing on the second motion for sanctions and to compel.  (D. 103, p. 7).

The court declines to strike the memorandum.  First and foremost, the court did not rely on any *new* information in the memorandum in denying In Spite's request for sanctions.  Imposing the requested sanction would therefore serve no useful purpose.

Second, "District courts enjoy broad latitude in administering local rules."  *Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.*, 26 F.3d 220, 224 (1st Cir. 1994); *accord Morales-Figueroa v. Santos*, 989 F.3d 58, 59-60 (1st Cir. 2021) ("stating that district courts receive considerable deference in the application of their own local rules" (citing *García-Goyco v. Law Env't Consultants, Inc.*, 428 F.3d 14, 19-20 (1st Cir. 2005))).  Indeed, the plain language of Local Rule 1.3 provides that a failure to comply with an obligation in "these rules *may* result in . . . sanctions *as deemed appropriate* by the judicial officer."  L.R. 1.3 (emphasis added).  Although the defendants violated Local Rule 7.1(b)(3) by filing the memorandum without leave of court, the court, in its discretion, excuses the violation.

D.  **Rule 37 Costs for Bringing Motion**

Pursuant to Rule 37(a)(5)(A), In Spite asks for costs and attorneys' fees for bringing the present motion for sanctions and to compel, assuming the motion is granted.  The request goes no further where the court did not outright grant the motion but

rather allowed in part and denied in part the pending motion. (D. 93). Specifically, the court allowed the motion by ordering production of the bank statements for a limited period of five months (as opposed to the period dating back to March 1, 2017) and denied the motion insofar as it requested inherent-power sanctions and bank statements prior to May 1, 2021.

The allowance in part and denial in part of the motion to compel invokes a discretionary basis to award costs and fees under Rule 37(a)(5)(C). *See Shea v. Millett*, Civil Action No. 17-cv-12233-ADB, 2019 WL 4218477, at *2 (D. Mass. Sept. 9, 2019) (denying "Defendant's request for costs and fees pursuant to its discretion under Federal Rule of Civil Procedure 37 to apportion reasonable expenses for a motion to compel that is granted in part and denied in part") (citing Rule 37(a)(5)(C)); ("If the motion is granted in part and denied in part, the court *may* . . . apportion the reasonable expenses for the motion.") (emphasis added).

Here, the defendants on balance engaged in legitimate advocacy of their positions. Whereas certain arguments on the part of the defendants were not well-taken, others were reasonable. Exercising the court's discretion, In Spite's requests for an award of costs and attorney's fees are denied.

E.   **Defendants' Request for Sanctions**

As a separate matter, the defendants have not formally moved for sanctions but request through their memorandum that the court

impose sanctions on In Spite.  (D. 103, pp. 12-15).  Putting aside the defendants' contention that Massachusetts state law warrants sanctions,[14] the defendants also assert that federal law provides a basis for sanctions.  To that end, they argue that In Spite's repetitive filing of the three motions for sanctions and to compel amounts to vexatious conduct, and that In Spite's conduct is designed "to harass the [d]efendants with continued, burdensome motions targeted at damaging [d]efendants financially."  (D. 103).  Relying on *Chambers*, 501 U.S. at 56-57, and *Goodyear Tire & Rubber*, 581 U.S. 101, 109 (2017), they request:  (1) attorneys' fees incurred for defending against In Spite's motions; and (2) injunctive relief preventing In Spite from asserting further discovery motions.  In the alternative, they seek to dismiss this case with prejudice on the basis that In Spite's conduct has paralyzed the progress of this case.  (D. 103).

Examining these requested sanctions seriatim, an award of attorneys' fees entails a finding that a party acted in bad faith. *See Goodyear Tire*, 581 U.S.at 107 (citing *Chambers*, 501 U.S. at 45).  It is more than evident that In Spite did not engage in such

---

[14] The defendants' request for sanctions cites not only to federal law but also to Massachusetts law.  (D. 103, pp. 13-14).  Notwithstanding the removal of this case from state court grounded on diversity jurisdiction, federal law applies when imposing sanctions for litigation misconduct.  *See Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 80 (1st Cir. 2002) (holding when "federal district court sits in diversity jurisdiction, its inherent power to impose monetary sanctions for contumacious conduct during the course of litigation is not circumscribed by the forum state's law regarding the imposition of sanctions.").

conduct, but rather acted in a cooperative manner; it agreed to the defendants' request for an extension of time to file an answer and did not oppose the defendants' motion to extend the deadline to complete fact discovery by 60 days.  Although In Spite did file three successive motions for sanctions and to compel, the motions were not frivolous.

Next, injunctive relief precluding In Spite from filing further discovery motions is inapt as a sought remedy where discovery is closed, and a trial is set for December 16, 2024.

Finally, the defendants' alternative request to dismiss the action with prejudice is equally meritless.  To be sure, the court has the inherent authority to dismiss a lawsuit, but a dismissal "is a particularly severe sanction." *Chambers*, 501 U.S. at 45 (citing  (citing *Roadway Express,* 447 U.S. at 765).  Ordinarily, it "should be employed as a sanction only when a plaintiff's misconduct is extreme." *Young v. Gordon*, 330 F.3d 76, 81 (1st Cir. 2003); *see, e.g.*, *Decoulos v. Schroder*, Civil Action No. 11-10972-DPW (D. Mass. June 24, 2020) (describing dismissal under inherent power as permissible "when objectively unreasonable litigation-multiplying conduct continues despite a warning to desist") (citation omitted).  In Spite has not engaged in extreme misconduct, let alone misconduct.

**V.   <u>CONCLUSION</u>**

For the reasons explained and detailed above, the motion for sanctions and to compel (D. 100) is **<u>ALLOWED</u>** in part and **<u>DENIED</u>** in part.  The defendants' request for sanctions (D. 103) is **<u>DENIED</u>**.

<u>/s/ Donald L. Cabell</u>
DONALD L. CABELL, Chief U.S.M.J.

DATED:  September 3, 2024